1

2

3

4

5

6

7

8                          IN THE UNITED STATES DISTRICT COURT

9                        FOR THE EASTERN DISTRICT OF CALIFORNIA

10   MARVELLOUS A. X. GREENE,

11              Plaintiff,                    No. CIV S-03-1854 DFL EFB P

12        vs.

13   SCOTT M. KERNAN,[1]

14              Defendant.                    <u>FINDINGS AND RECOMMENDATIONS</u>

15   _____/

16        Plaintiff is a prisoner without counsel seeking relief for an alleged violation of Title II of

17   the Americans with Disabilities Act.  *See* 42 U.S.C. §§ 12131-12164.  Plaintiff claims that from

18   August 3, 1998, through October 2003, he was denied a job because he has epilepsy.  Defendant

19   Kernan moves for summary judgment on the ground that there is no genuine issue about whether

20   plaintiff suffered discrimination based solely on a disability, i.e. epilepsy.  Plaintiff opposes the

21   motion.  For the reasons explained below, the court finds that there is no genuine issue for trial.

22   **I.    Facts**

23        In order to understand plaintiff's claim and why it must fail on summary judgment, it is

24   necessary to understand the California Department of Corrections and Rehabilitation's

25   _____

26        [1]  The former warden, Cheryl Pliler sued in her official capacity as the warden of
California State Prison, retired.  Her successor, the current warden, Scott Kernan, is substituted
as the defendant.  *See* Fed. R. Civ. P. 25(d)(1).

("CDCR") "work/privilege group" designations. The administrative code makes it an obligation for all "able-bodied" prisoners to work and/or obtain an education. Cal. Code Reg. tit. 15, § 3040(a). Thus, all prisoners are placed in a work/training group, designated A-1, A-2, B-1, B-2, and so on. Cal. Code Regs. tit. 15, § 3044. Work/training group "A-1" includes prisoners eligible for full time work and training. Cal. Code Regs. tit. 15, § 3044(b)(2). Prisoners in work group A-1 are eligible for full-time educational and work assignments, while those in work group A-2 are deemed "willing but unable to perform" a full-time assignment, and either are put on a waiting list for a full-time assignment or are waiting for an adverse transfer to a different institution. Cal. Code Regs. tit. 15, § 3044(2), (3).

Within each work/training group, prisoners are given lower or higher priority for obtaining a job, depending on the "effective date"[2] assigned to the prisoner. Declaration of J. Mayfield ("Mayfield Decl."), at ¶ 4; Declaration of C. Pliler ("Pliler Decl."), at ¶ 4. The "effective date" is assigned after a classification committee[3] has determined the prisoner's work/training and privilege groups. Mayfield Decl., at ¶ 4. Prisoners with earlier effective dates have priority over those in the same work/training group with later effective dates. *Id.*, at ¶ 4. Therefore, prisoners in the A-1 work/training group will receive an assignment before those in the A-2 group. *Id.*, at ¶ 6; Pliler Decl., at ¶ 5; *see also* Deposition of Plaintiff ("Pl. Dep."), at 15. A newly convicted prisoner in the A-1 group will be assigned before a prisoner in the B-2 group who has been in prison for years. Mayfield Decl., at ¶ 6; Pliler Decl., at ¶ 5. However, recent budget cuts have caused a decrease in the number of positions available. Therefore, a prisoner in

---

[2] Defendant does not explain how prison officials determine the date.

[3] An Initial Classification Committee ("ICC") establishes a prisoner in an institution by making sure he understands what is expected of him, what programs are available, assigning a custody designation and placing the prisoner in a work/privilege group. Cal. Code Regs. tit. 15, § 3376(d). A Unit Classification Committee ("UCC") reviews a prisoner's situation annually and makes adjustments where necessary. Cal. Code Regs. tit. 15, § 3376(d)(2). An Institution and Facility Classification Committee ("IFCC") is more specialized, accepting referrals from other committees, reviewing prisoners' requests and changing a prisoner's work/privilege group if there are circumstances warranting such change. Cal. Code Regs. tit. 15, § 3376(d)(3).

the A-2 group may have to wait years before a position becomes available.  Mayfield Decl., at ¶ 7.

A prisoner in the A-1 group may be removed from that group and placed in a group designated A-2.  *Id*., at ¶ 5.  Among the reasons for such a change is a disciplinary conviction or a decision by a classification committee while a disciplinary charge is investigated.  *Id*., at ¶ 5; Cal. Code Regs. tit. 15, §§ 3045.1.  Thus, not only is employment an obligation; it is also a privilege.  Mayfield Decl., at ¶ 7.   However, a prisoner's disability is not automatically a ground for removal or exclusion from the A-1 group. *Id*., at ¶ 5; Cal. Code Regs. tit. 15, § 3044(b)(2)(D).  Ordinarily, a partially disabled prisoner in an unsuitable position will be moved to a suitable position.  Mayfield Decl., at ¶ 5;  Cal. Code Regs. tit. 15, § 3044(b)(2)(E).

Prisoners also are placed in a "privilege" group, designated A-D and U.  Cal. Code Regs. tit. 15, § 3044(c), (d).  Privileges are earned and are conditioned on, *inter alia*, satisfactory performance of a job assignment.  *Id*., at § 3044(c), (c)(8)(A).  The various privileges that may or may not pertain to a given group include canteen access, work/training group assignments, family visits, telephone access and personal packages from friends and relatives.  *Id*., at § 3044(d)-(h).  Thus, defendant's references to a prisoner's "work/privilege group" indicates the work/training group and the privilege group to which a prisoner belongs, e.g.,  "A-1/A," or "A-2/B."

The security risk that a prisoner poses also affects his employment and training prospects. Therefore, job opportunities are limited for prisoners with a high custody level and who do not have "gate pass clearance."  Mayfield Decl., at ¶ 9.  For example, "Medium A" is the fourth highest of seven custody levels.  Cal. Code Regs., tit.15, § 3377.1(a).  The custody level "Close B," is the third highest.  *Id*., at § 3377.1(a).  Prisoners with this classification  must be housed in a cell, rather than a dormitory, inside the prison's security perimeter.  Mayfield Decl., at ¶ 8; Cal. Code Regs. tit.15, § 3377.1(a)(4)(A).  The hours during which and the locations in which they may work are more restricted than that of prisoners classified as Medium A, and they must be

1  directly supervised at all times, including while working.  Cal. Code Regs. tit.15, § 3377.1(a)(4),

2  (6); *see also* Mayfield Decl., at ¶ 8; *see also* Pl. Dep., at 17.  Any job requiring independent,

3  unsupervised activity is unavailable to a Close-B prisoner.  Mayfield Decl., at ¶ 8.  Prisoners

4  without gate pass clearance cannot work in a job located inside the perimeter fence if the

5  prisoner has to go through a "work change area,"[4] or in a job outside the perimeter fence or off

6  the institution's property.  *Id.*, at ¶ 9.

7       Turning to plaintiff's situation, he has had epilepsy since at least 1992.  Pl. Dep., at 25-

8  26.  He was convicted of rape with a foreign object and assault with force causing great bodily

9  injury in 1996.  On August 3, 1998, he was transferred from Deuel Vocational Institution to

10  California State Prison - Sacramento.  Mayfield Decl., at ¶ 10; Def.'s Statement of Undisputed

11  Facts ("SUF"), Ex. A, Attach. A, at 4.  Plaintiff asserts that when properly medicated, he has two

12  or three seizures every month, but he is not properly medicated in prison.  Pl. Dep., at 25.  He

13  also asserts that when properly medicated, an upset stomach warns him of an oncoming seizure.

14  *Id*.  On the current medication, however, seizures occur without warning.  *Id*.  The record does

15  not reveal what seizure medication plaintiff was taking at the time of the events giving rise to

16  this action, whether California State Prison - Sacramento physicians changed his medication

17  when he arrived there, or how frequently plaintiff had seizures at California State Prison -

18  Sacramento.  However, plaintiff asserts that before he was transferred, he had a culinary job

19  assignment and after he was transferred, he requested the same.  Pl. Dep., at 24.

20       Around August 1998, plaintiff had gate pass clearance and he was in work/privilege

21  group A-1/A.  Mayfield Decl., at ¶ 11.  On January 12, 1999, plaintiff appeared before the

22  classification committee for an annual review.   Def.'s SUF, Ex. A, Attach. A, at 4.  At that time,

23  his custody level was Medium-A, his work/training group was A-1, his job assignment was

24  "laundry."  *Id*.  On February 25, 1999, plaintiff lost his job and was placed in administrative

25

26       [4] Defendant does not define this term.

segregation for threatening staff.  Mayfield Decl., at ¶ 11;  Def.'s SUF, Ex. A, Attach. A, at 5.
At a June 17, 1999, classification committee review of this placement, the committee retained
plaintiff's custody at Medium-A, but his work/privilege group was lowered to A-2/B. *Id*.  He
also had gate pass clearance. *Id.*   On July 9, 1999, the Chief Physician and Surgeon issued a
document, known as a "chrono."[5]   The document states that plaintiff had a seizure disorder, and
he therefore should  have a lower bunk on the lower tier, and he could not have any job
assignment involving driving, or operating hazardous machinery.  Def.'s SUF, Ex. A, Attach. A,
at 8.  Neither could he work around hot liquids, high places or in a culinary position.  *Id*.  These
restrictions were renewed annually, as explained below, and remained in effect until plaintiff
was transferred to a different prison.  Mayfield Decl., at ¶ 12.  Plaintiff asserts that just before
this document was issued, he requested, and was denied, a culinary position at California State
Prison - Sacramento.  Pl. Dep., at 24.

      At some point not revealed in the record, plaintiff was released from administrative
segregation, but he was placed there again on August 1, 1999, for possession of a weapon.
Def.'s SUF, Ex. A, Attach. A, at 5.  The committee found that plaintiff was a threat to the safety
of the institution, decided to hold him in administrative segregation pending a hearing on the
charge, and changed plaintiff's work/privilege group to D-1/D.  *Id*.  There was no mention of
gate pass clearance.  *Id*.  On February 18, 2000, plaintiff still had not had a hearing on the charge
of possession of a weapon, but appeared before a classification committee for a periodic review
of his administrative segregation placement.  *Id*., at 7.   The committee released plaintiff from
administrative segregation, classified him as custody level Close B, elevated his work/training
group to A-2/B, but denied him gate pass clearance.  *Id*.  Because of this change, he was placed
on a waiting list for a support services job not requiring gate pass clearance.  Mayfield Decl., at

---

[5]  Neither party defines this term.  However, it appears to refer to a "Chronological
History," which is a document "prepared for each inmate, upon which significant dates and
commitment information affecting the inmate are logged."  Cal. Code Regs. tit. 15, § 3000.

¶ 11.

On March 2, 2000, plaintiff was placed in administrative segregation for possession of escape paraphernalia, i.e., four piles of prisoner-made rope with a total length of about 63 feet. Def.'s SUF, Ex. A, Attach. A, at 12. While the charge was investigated, plaintiff was classified as Close B custody, work/privilege A-2/B, and had no gate pass clearance. *Id.,* at 13. He was convicted of the charge on July 16, 2000. *Id.,* at 15. After his release from this administrative segregation term, he returned, at his own request, on April 11, 2000, after expressing a fear of enemies. *Id.,* at 16. His custody was Close B, his work/privilege group was A-2/B, and he had no gate pass clearance. *Id.*

On July 7, 2000, the Chief Physician and Surgeon renewed plaintiff's lower bunk authorization and work exemptions for one year. Def.'s SUF, Ex. A, Attach. A, at 9. At an annual classification hearing on February 20, 2001, prison officials maintained plaintiff's Close-B, A-2/B, no gate pass clearance designations. *Id.,* at 17. On July 6, 2001, the Chief Physician and Surgeon renewed plaintiff's lower bunk authorization and work exemptions for another year. *Id.,* at 10.

At plaintiff's February 5, 2002, annual classification committee appearance, prison officials again retained plaintiff at Close-B custody, A-2/B work/privilege group, with no gate pass clearance. Def.'s SUF, Ex. A, Attach. A, at 18. Once again, on July 29, 2002, the Chief Physician and Surgeon renewed plaintiff's lower bunk authorization and work exemptions for another year. *Id*., at 11. At plaintiff's February 2003, annual classification review, prison officials decided not to change plaintiff's work status or classification level. *Id.,* at 19.

On March 21, 2003, plaintiff was moved to California State Prison in Lancaster.

////

////

////

////

## II.      Standards for Summary Judgment

Summary judgment is appropriate when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).[6]  The standards under Rule 56 to determine whether there is a "genuine issue of material fact" are well established:

> [T]he Supreme Court, by clarifying what the non-moving party must do to withstand a motion for summary judgment, has increased the utility of summary judgment. First, the Court has made clear that if the nonmoving party will bear the burden of proof at trial as to an element essential to its case, and that party fails to make a showing sufficient to establish a genuine dispute of fact with respect to the existence of that element, then summary judgment is appropriate. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  Second, to withstand a motion for summary judgment, the non-moving party must show that there are "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) (emphasis added).  Finally, if the factual context makes the non-moving party's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).  No longer can it be argued that *any disagreement* about a material issue of fact precludes the use of summary judgment.

*California Arch. Bldg. Prod. v. Franciscan Ceramics*, 818 F.2d 1466, 1468 (9th Cir.), *cert. denied*, 484 U.S. 1006 (1988) (parallel citations omitted) (emphasis added).  In short, there is no "genuine issue as to material fact," if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Grimes v. City and Country of San Francisco*, 951 F.2d 236, 239 (9th Cir. 1991) (quoting *Celotex*, 477 U.S. at 322).  There can be no genuine issue as to any material fact where there is a complete failure of proof as to an essential element of the

---

[6] On October 5, 2004, the court informed plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), *cert. denied*, 527 U.S. 1035 (1999), and *Klingele v. Eikenberry*, 849 F.2d 409, 411-12 (9th Cir. 1988).

1    nonmoving party's case because all other facts are thereby rendered immaterial. *Celotex,* 477

2    U.S. at 323.

3          With these standards in mind, it is important to note that plaintiff bears the burden of

4    proof at trial over the issue raised on this motion, i.e., whether the defendant discriminated

5    against him based solely on his disability.  Equally important is that discrimination based solely

6    on a disability is an essential element of plaintiff's cause of action.  Therefore, to withstand

7    defendant's motion, plaintiff may not rest on the mere allegations or denials of his pleadings.  He

8    must demonstrate a genuine issue for trial. *Valandingham v. Bojorquez*, 866 F.2d 1135, 1142

9    (9th Cir. 1989).  He must rely on evidence based upon which a fair-minded jury "could return a

10   verdict for [him] on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248,

11   252.

12         "As to materiality, the substantive law will identify which facts are material.  Only

13   disputes over facts that might affect the outcome of the suit under the governing law will

14   properly preclude the entry of summary judgment." *Id.* at 248.  Here, plaintiff's action arises

15   under Title II of the Americans with Disabilities Act.  To prevail at trial, he must prove by a

16   preponderance of competent evidence that he:  (1) is disabled; (2) is eligible, with or without

17   accommodation, to receive or participate in a public entity's services, programs or activities; (3)

18   he was excluded him from participation in or denied him the benefits of its services, programs or

19   activities, or otherwise discriminated against him; and (4) the exclusion, denial of benefits, or

20   discrimination was by reason of the plaintiff's disability. *Thompson v. Davis*, 295 F.3d 890, 895

21   (9th Cir. 2002).

22   **III.   Analysis**

23         As stated, plaintiff's action is one against defendant Pliler in her official capacity for a

24   violation of Title II of the ADA.  From the complaint, the court understands plaintiff to claim

25   that he was removed from his "laundry" job assignment based on his seizure condition.  Compl.,

26   at 2-3.  Defendant does not challenge plaintiff's ability to prove the first three elements of his

8

1   case, i.e., that plaintiff is disabled, that he is eligible with or without accommodation to

2   participate in a public entities programs or services, or that he was excluded from such programs

3   or services.  These elements, therefore, are easily disposed of.  There is no question that, for

4   purposes of Title II of the ADA, service, programs, and activities cover all of the operations of a

5   qualifying government, *Bay Area Addiction Research and Treatment, Inc. v. City of Antioch*, 179

6   F.3d 725, 731 (9th Cir. 1999), including those within the purview of state prison officials.

7   *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209 (1998); *see also, Armstrong v. Wilson*,

8   124 F.3d 1019, 1024 (9th Cir. 1997).  Therefore, the court finds that the CDCR's work/training -

9   privilege incentive program is covered by Title II of the A.D.A.  Second, it is undisputed that

10  plaintiff has had epilepsy since at least 1992, and periodically has seizures.  Epilepsy can amount

11  to a disability.  *See Dark v. Curry County*, 451 F.2d 1078, 1084 (9th Cir. 2005).  Third, it is

12  undisputed that plaintiff was removed from his job in "laundry."

13          The question defendant presents in the motion is whether there is a genuine dispute about

14  whether plaintiff suffered discrimination because he is disabled, and defendant asserts that there

15  is not.  Def.'s Mot., at 6.  Plaintiff, therefore, must adduce evidence that he suffered

16  discrimination with respect to CDCR's program "by reason of [his] disability."  *See* 42 U.S.C.

17  § 1232.  In this regard, his evidence must show that prison staff discriminated against him

18  "solely by reason of [his] disability."  *Weinreich v. Los Angeles County*, 114 F.3d 976, 978 (9th

19  Cir. 1997).  The undisputed evidence shows that prisoners, including disabled prisoners,

20  presumably will work and receive training once their work/privilege groups and security

21  classifications have been determined.  Since the work/privilege system is, in part, designed to be

22  an incentive to good behavior, misconduct can result in what effectively amounts to a

23  work/privilege demotion and consequent limiting of job opportunities.  Misconduct also can lead

24  to an increased security classification and consequent limiting of job opportunities.  Given that

25  budget constraints have caused the number of job opportunities to decrease, misconduct can lead

26  to prolonged unemployment.  Plaintiff's loss of his job at California State Prison - Sacramento

1    must be viewed within the context of this system.

2            On January 12, 1999, several months after plaintiff arrived at California State Prison -

3    Sacramento, prison officials placed him in the work/privilege group most likely to be assigned a

4    job, i.e., A-1/A.  They classified him as Medium-A, allowing a broad range of employment

5    opportunities, and in fact assigned him to a job in "laundry."  Given the classification committee

6    system, it is reasonable to infer that plaintiff's epilepsy was known.  However, the evidence

7    cannot support an inference that plaintiff lost the laundry job because of his medical condition.

8    On February 25, 1999, plaintiff was placed in administrative segregation for threatening staff.

9    During a June 17, 1999, periodic review of this placement, a classification committee lowered

10   plaintiff's work/privilege group to A-2/B and plaintiff was removed from his laundry job.

11           Several weeks later on July 9, 1999, the Chief Physician and Surgeon issued the first in a

12   series of chronos requiring that plaintiff be given a lower bunk on a lower tier because of his

13   epilepsy.  He also limited plaintiff's job assignment possibilities, excluding plaintiff from any

14   assignment involving driving, operating hazardous machinery, or working around hazardous

15   machinery, hot liquids, in high places or in culinary positions.  Plaintiff asserts that this chrono

16   evidences discrimination because it issued shortly after he requested a culinary job assignment.

17   Pl. Dep., at 24.  This speculative premise bears little relation to the claim in his complaint.  It is

18   also flatly contradicted by uncontraverted evidence showing that the classification committee

19   lowered plaintiff's work/privilege group to A-2/B after he threatened staff and this resulted in

20   plaintiff being removed from the laundry job.

21           While it is reasonable to infer that the chrono was a response to plaintiff's request, it does

22   not show that he was removed from his laundry job assignment because of his epilepsy.  It is

23   undisputed that prison officials removed him from his laundry job no later than June 17, 1999,

24   several weeks before the July 9, 1999, chrono.  Moreover, the chrono authorized plaintiff to have

25   a lower bunk on a lower tier, a privilege obviously aimed to ensure plaintiff's safety and not to

26   put him at any disadvantage.  The court cannot ignore prison officials' constitutional obligation

1   to ensure the safety of prisoners in the employment context.  *See Berry v. Bunnell*, 39 F.3d 1056,

2   1057 (9th Cir.1994) ( Eighth Amendment applies where prisoners must work and are "compelled

3   to perform physical labor which is beyond their strength, endangers their lives or health, or

4   causes undue pain.").   Unlike the lowering of plaintiff's work/privilege group because of his

5   threats to staff, the chrono was not a punitive measure at all.   Rather than penalize plaintiff, the

6   chrono was designed to ensure that, in the event plaintiff had a seizure during work hours,

7   neither he nor any other prisoner would be injured.   Plaintiff presents no evidence that after

8   being placed in the A-2/B group he was eligible for his former laundry assignment (or for a

9   culinary assignment).   Neither has he submitted evidence showing that if he was, there were

10  open positions available to him based on his priority level.   Finally, he has not submitted

11  evidence that despite his eligibility for and the existence of such positions, he was not given the

12  assignment solely because of his epilepsy.   Therefore, plaintiff has not demonstrated a genuine

13  dispute about whether the February 1999 work/privilege re-assignment and the 1999 chrono

14  constituted discrimination against plaintiff by reason of his disability.   A reasonable jury could

15  not rely upon the evidence presented here to return a verdict in plaintiff's favor.

16         Furthermore, the evidence demonstrates that plaintiff continued to engage in conduct that

17  justified both his continued work/privilege group demotion and his increased custody

18  classification.   On August 1, 1999, plaintiff was placed in administrative segregation because he

19  was charged with possession of a weapon.   On February 18, 2000, a classification committee

20  decided to retain him in work/privilege group A-2/B and at Close-B custody.   At the end of the

21  day on February 18, 2000, plaintiff was released from administrative segregation.   However, he

22  was returned there on March 2, 2000, because he was charged with possession of escape

23  paraphernalia.   The housing and job assignment chrono was also renewed annually during this

24  time, but again, plaintiff has not submitted any evidence that, given his group assignments and

25  security classification, job opportunities were available to him from which he was excluded

26  because of his epilepsy.

Overall, the evidence shows that when plaintiff arrived at California State Prison - Sacramento, he was epileptic, his behavioral history justified giving him priority for employment, and he was in fact employed.  He was not deprived of employment even though he was epileptic. Shortly after his arrival, he repeatedly engaged in misconduct that justified "demoting" him to a work/privilege group that did not guarantee employment and that justified removing him from his job assignment in "laundry."  Plaintiff has submitted no evidence that shows his removal from work/privilege group A-1/A was related to his epilepsy.  In light of these facts, the court cannot find that there is a genuine dispute that plaintiff lost his job and remained unemployed for an extended period of time because of disability discrimination.  On this evidence, a reasonable jury could not find in plaintiff's favor on the question of discrimination and defendant is entitled to summary judgment.

Accordingly, it is hereby RECOMMENDED that defendant's September 28, 2006, motion for summary judgment be granted and that judgment be entered in defendant's favor.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

Dated:  February 27, 2007.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE